# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 9, 2013 Session

## JOHNIE JEFFERSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. P-26833     James C. Beasley, Jr., Judge

---

**No. W2012-01867-CCA-R3-PC - Filed October 2, 2013**

---

The petitioner, Johnie Jefferson, appeals the trial court's dismissal of his petition for writ of error coram nobis. He argues that he is entitled to coram nobis relief because the State suppressed exculpatory evidence that became known to him after the limitations period had expired. After review, we affirm the dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Terita Hewlett Riley, Memphis, Tennessee, for the appellant, Johnie Jefferson.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Reginald Henderson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

On September 17, 1999, the petitioner was convicted of the first degree premeditated murder of Kelvert Hailey and sentenced to life imprisonment. To aid in understanding the issue at hand, we find it helpful to note the underlying facts of the case as recited by this court:

> Raniko Lindsey Bonner testified that in November 1997, she was living with her children and Marlo Richardson at Hurt Village Apartments. Bonner testified that at the time, she knew a man that she referred to as "MacLarry,"

whom she identified in court as Larry Johnson. Bonner testified that she was also associated with a man that she referred to as "J-Rock," whom she identified in court as Johnie Jefferson. According to Bonner, both men were members of a gang called the Gangster's Disciples. At that time, Bonner testified that she was dating a man named Tony Phillips (a.k.a."T-Money"). According to Bonner, Phillips was the leader of the Gangster's Disciples, although Bonner claimed she did not know that at the time of the offense.

Bonner testified that on November 3, 1997, she was at home with her mother, Phillips, Jefferson, Richardson, and Richardson's boyfriend, Dushack. Bonner testified that there were knocks at her front and back doors. Bonner opened the back door and saw Larry Johnson and Marcus Glass (a.k.a."Sporty"). Bonner then opened the front door to find Robert Walker. Bonner testified that Walker gave her some alcohol and asked her to fix him a sandwich. After Bonner gave Walker the sandwich, Glass called Jefferson away from the table where he was sitting. Jefferson went to the back of the apartment and spoke to Johnson and Glass.

Bonner testified that after the conversation, she asked Johnson to take her to her aunt's house. Johnson said that he couldn't because "he had some business to take care of." Bonner went upstairs to straighten up her room, and when she came back, Jefferson, Johnson and Glass had all gone.

Bonner testified that she saw Johnson the next night when he and Glass returned to Bonner's apartment. Bonner testified that the Defendants told her that "one of the folks was found dead in the park." Bonner testified that "folks" refers to members of the Gangster's Disciples.

Marcus Rydell Glass (a.k.a."Sporty") testified that he was charged in this case with facilitation of the murder in the first degree of Kelvert Hailey, the victim in this case. Glass testified that he had been a member of the Gangster's Disciples since 1989. Glass testified that there is an organizational structure to the gang in which he stated that he held the position of "chief of security." According to Glass, there are certain rules in the gang, and those members that do not follow the rules are punished. As "chief of security" for the city, Glass worked under Tony Phillips, who is the "overseer." Robert Walker, Johnie Jefferson and Larry Johnson were also "chief [s] of security." One of the duties of a "chief of security" is "handling violations."

Glass testified that he knew the victim as a member of the Gangster's

Disciples but did not know if the victim held a position within the organization. According to Glass, the victim had violated one of the rules of the Gangster's Disciples. Glass testified that on November 3, 1997, Larry Johnson called him and asked him to come to the home of Johnson's girlfriend. Johnson told Glass that the victim was there. At some point after Glass arrived, the victim left. Glass and Johnson left and found the victim near where Johnson's car had been parked. The victim asked if he could get a ride to a club called Ebony Lace. According to Glass, the victim did not know that he was in trouble.

Johnson, Glass and the victim left the apartment complex and went to Burger King. At the restaurant, Johnson approached Glass and told him that "instead of dropping [the victim] off we're going to go get a bag of weed so we can smoke it." The three men then went to an apartment complex called Hurt Village. Once there, Glass and Johnson went into an apartment that belonged to Tony Phillips' girlfriend, Raniko Bonner (a.k.a."Nikki"). Jefferson, Phillips, and Walker (a.k.a."McRob") were all there. Jefferson and Walker told Phillips that the victim was in the car. Glass testified that he was carrying a .380 Smith and Wesson gun; that Johnson was carrying a .357 Smith and Wesson revolver; and that Jefferson was carrying a nine-millimeter Smith and Wesson gun. According to Glass, all of the guns were provided by Tony Phillips.

Johnson, Jefferson and Glass left the apartment. While standing outside, Johnson explained to Jefferson that he had "set[ ] . . . [the victim] up" by telling the victim that they were going to get some marijuana. The three men then got in Johnson's car along with the victim. With Johnson driving, the men went to Levi Road in Whitehaven. When asked why they went to Levi Road, Glass testified that he guessed it was "to kill [the victim]." Johnson parked the car on the side of Levi Road. Jefferson then got out of the car and said that he had to urinate; however, he instead opened the back door and pulled the victim out of the car at gunpoint. Glass testified that the victim told him to tell them that he was begging for his life. Johnson tried to help Jefferson pull the victim out of the car, and at that point, the victim tried to run.

Glass testified that when the victim started to run, Johnson shot him twice in the back. The victim tried to run to the left into the woods, but he fell. Jefferson took the gun from Johnson and shot the victim four times while he was lying on the ground. Jefferson then got his own gun and shot the victim

-3-

twice more. Jefferson and Johnson got back in the car, and Jefferson said that the victim was "broke." Glass remained in the car during the incident. Glass testified that he was in trouble with the organization for not participating in the murder.

Glass testified that he went to Tony Phillips' house the next day to give him back his gun. Phillips wanted the guns back so that he could "drill them out." According to Glass, Phillips wanted to drill the grooves out of the gun to change its ballistics. Johnson and Jefferson were both at Phillips' house, having the same thing done to their guns. Glass identified in court the guns used to kill the victim as the ones that Jefferson and Johnson used on November 3, 1997.

After the murder, Glass left town and went to Chicago. When Glass called his mother, she told him that the Fugitive Squad was looking for him. Glass called Phillips. According to Glass, Phillips told him "what he was going to do to [Glass]" if he went to the authorities. After a week in Chicago, Glass went back to Memphis where he again talked to Phillips. Glass testified that Phillips threatened him and his family.

Robert Walker testified that he was raised in Detroit and that while there, he became a member of the Black Gangster's Disciples. Walker testified that the Black Gangster's Disciples was different from the Gangster's Disciples in Memphis. When Walker moved to Memphis in 1996, he joined the Gangster's Disciples. Walker testified that he eventually held the position of "chief security" of the city and reported directly to the "overseer," Tony Phillips. Walker testified that Jefferson and Johnson were also "chief[s] of security."

Walker, with the aid of a chart, testified regarding the organizational structure of the Gangster's Disciples. According to Walker, Phillips was the "overseer" of the organization in Memphis. Jefferson was a "chief of security" in charge of enforcement, and Johnson and Glass were Jefferson's two assistants. Walker testified that he was also a "chief of security" in charge of growth and development. Walker explained that as part of his job within the organization, he investigated and punished violations. Walker testified that he and Jefferson frequently met at Phillip[s'] residence to discuss gang business.

Regarding Jefferson's position as an "enforcer," Walker testified that if Phillips "tell[s] him to go out there and kill somebody, he'll do it."

-4-

According to Walker, there are some violations within the organization that necessarily result in death. One of those violations is "1919," which is when a gang member gives a statement to police. Walker said that he was aware that the victim was in trouble with the organization because he had broken "1919."

Walker testified that on November 3, 1997, he, Phillips, Jefferson, and Richardson were all at the home of Raniko Bonner, Walker's sister. Johnson and Glass arrived later in Johnson's car. Walker testified that Johnson was carrying a .357 revolver and Glass was carrying a ".380." Walker testified that Johnson talked to Phillips and told him that they had the victim in the car. According to Walker, Phillips told Jefferson to "take care of his business" and winked his right eye. Walker testified that the winking of the right eye signified that Jefferson was supposed to "put [the victim] to sleep." Jefferson then left with Glass and Johnson. Walker testified that he walked outside with them, and Johnson told him that "he was fixing to go kill dude."

Marlo Richardson (a.k.a. "Loony Toon") testified that she talked to Marcus Glass after the death of the victim and that Glass told her that "he didn't mean it to happen that way." According to Richardson, Glass said that he shot the victim. Richardson testified that he lived with Raniko Bonner at Hurt Village Apartments. Richardson testified that she remembered the day that Phillips, Walker, Jefferson, and Glass were all at Bonner's apartment. Richardson testified that Johnson was not there. Richardson testified that Glass, Jefferson, and Walker all left. Although Richardson testified at trial that Johnson was not at Bonner's place on November 4, 1997, she admitted in her statement that Phillips, Walker, Johnson, Glass and Jefferson were all there, and she recalled that they were discussing that someone had been killed.

Alvin Odom testified that on November 4, 1997, he was riding in a car with his wife. The couple had just dropped off their children at elementary school and were traveling on Levi Road taking their daughter to day care. While on Levi Road Odom saw a man, later identified as the victim, Kelvert Hailey, lying in a ditch. He first thought that the man had just passed out and asked his wife if they should try to wake him up. His wife agreed, and they turned the car around and headed back towards where they had seen the man. After they pulled up beside the man, Odom began to get out of his car when his wife started "shaking and crying." She said that she saw holes in the man's head. The Odoms immediately went back to the elementary school where they had dropped off their children and told a teacher what they had seen. The teacher then called the police, and the Odoms returned to where they had

found the body and waited for the police.

Byron Braxton of the Memphis Police Department responded to the call and arrived on the scene around 7:25 a.m. or 7:30 a.m. Braxton spoke to the Odoms and observed the crime scene. According to Braxton, the victim was "a male black wearing white tennis shoes, green jeans and a red and white jacket, laying [sic] in a semi fetal position, face down in a ditch on the north side of Levi." Braxton said that he observed a large hole in the back of the victim's head. Braxton testified that the area in which the victim was found was "relatively secluded," with no houses in the immediate vicinity and only a couple of businesses nearby. In addition to the body, Braxton observed two handgun shell casings near the body. Braxton also noticed "a scuff or some type of skid mark in the dirt, in line with the body in the ditch." A tooth was also found at the crime scene.

Officer Danny James, a member of the Crime Scene Unit of the Memphis Police Department, testified that he collected evidence at the crime scene. James testified that the victim's shoe print was on the pavement near the ditch where he was found. According to James, there were "little burs [sic] on [the victim's] lower pants and shoes and socks," which he believed someone would get if they walked or ran through weeds. Officer James took photographs of the victim's body, including a photograph of the victim's hand, which was clinched in a fist. Officer James testified that he did not find any physical evidence such as fingerprints, hair, or clothing fibers that belonged to the Defendants. Officer Shan Allen Tracy of the Memphis Police Department testified that a bullet was found in the dirt underneath where the victim's head had been.

Sergeant R.D. Roleson of the Memphis Police Department testified that he was assigned to locate the witnesses in this case. Larry Johnson was one of the individuals whom Roleson was assigned to locate. After talking to a witness named Melissa Looney at the homicide office, Sergeant Roleson requested that Looney call Larry Johnson's beeper. The number from which Johnson returned the call was traced, and the police then went to that location. A consent to search form for the house was obtained, but Johnson was not there. While there, Sergeant Roleson learned that Johnson's car was in the parking lot. Roleson testified that he had the car towed to the crime scene building to be processed. Roleson testified that he had the car towed because based on his investigation, it was likely that the victim was last seen in Johnson's vehicle.

A warrant was later obtained to search Johnson's vehicle. The warrant was based on the affidavit of Sergeant O.W. Stewart of the Memphis Police Department. The affidavit states, in pertinent part:

> [A]ffiant has received information relating to the shooting death of Kelvert Hailey from a reliable witness who advised that Larry Johnson and Marcus Glass were responsible for the death of Kelvert Hailey. This witness did see Marcus Glass armed with a black automatic handgun on Thursday, November 6, 1997 two days after the body was recovered on Tuesday, November 4, 1997 at 7:32 a.m. This reliable witness gave information that on Friday, October 31, 1997 this witness saw Larry Johnson in possession of a chrome revolver. The victim had been shot six times in the back and head and only two spent casings from a 9mm automatic were found on the scene of the Homicide, indicating that another weapon was involved. This witness also indicated that Marcus Glass and Larry Johnson were together on Monday night, November 3, 1997, until the early morning hours of Tuesday, November 4, 1997, were occupying Larry Johnson's 1984 Buick Lasabre, VIN # 1G4AN69Y8EX422903 and were with the victim just prior to the victim's death.

Officer Barry G. Lane of the Memphis Police Department, a member of the Crime Scene Unit, processed Larry Johnson's car. A revolver was found in its case in the trunk of the car. Lane also confiscated six live rounds from the car and a pawn shop ticket "in regards to the nine-millimeter pistol." Officer Lane obtained fingerprints from a photograph that was found in the vehicle. He also obtained fingerprints from the rearview mirror and a cologne bottle found inside. James Hill, a latent print examiner with the Memphis Police Department, testified that the fingerprints on the rearview mirror belonged to Larry Johnson and that the fingerprints on the photograph belonged to Tony Phillips.

Ronnie McWilliams testified that he worked as an investigator on the anti-gang team in the Attorney General's office. McWilliams testified that on October 6, 1997, he interviewed the victim regarding a robbery investigation. McWilliams talked to the victim "to gain knowledge of gangs in his area and what he knew about it." McWilliams testified that the victim indicated that he was a member of the Gangster's Disciples, but he did not discuss the structure

of the organization. McWilliams also testified that he participated in the execution of an Federal Bureau of Investigation (F.B.I.) search warrant on Tony Phillip[s'] residence. McWilliams testified that he found a drill and drill bits in the residence.

Robert Daniel Royce, a forensic scientist specializing in firearms identification with the Tennessee Bureau of Investigation (T.B.I.), testified that the bullet found in the ground beneath the victim's head matched the nine millimeter pistol that was entered into evidence. Royce also testified that the interior of the Smith and Wesson .357 Magnum revolver had been drilled out. Royce testified that he believed two weapons were used to kill the victim: a .357 revolver and nine millimeter pistol.

Defendant Jefferson testified that he was twenty-two years old and lived with his parents. Jefferson testified that he did not know about the victim's death until he was arrested on November 5, 1997. Jefferson stated that he had never seen or heard of the victim before November 5, 1997. When questioned about where he was on the day of the murder, Jefferson testified that he did not know. Jefferson also testified that he did not know Larry Johnson and had never heard of him before November 5, 1997.

Jefferson testified that he had been a member of the Gangster's Disciples since 1994, when he was seventeen years old. Jefferson testified that he did not hold a position within the organization. Jefferson testified that in 1995 he was charged with robbery and gave a statement against his co-defendant, also a member of the Gangster's Disciples. According to Jefferson, Glass contacted Jefferson and told him that "since [he] gave a statement, at that time [he] was told to take that charge for the robbery and let the co-defendant loose." Jefferson testified that he did not believe he had a choice and that he had to take the charge. Jefferson testified that when he made it known in 1995 that he wanted out of the organization, Glass told him that he had to "suffer the consequences." Jefferson testified that the consequences were death or being put into a situation to "get caught up." Jefferson testified that he did not know what positions Glass and Phillips held in the Gangster's Disciples, but he knew they "ranked high."

Defendant Larry Johnson testified that he played the organ at Al Green's church in Memphis. Johnson testified that he often visited his cousin Ira Farris, who lived with Tony Phillips and Totti Brown. Johnson testified that Phillips also cut his hair sometimes. Johnson testified that he did not

know that Phillips was a member of the Gangster's Disciples. Johnson testified that met Marcus Glass at Phillips' residence. Johnson stated that he sometimes transported Glass to the Hurt Village apartment complex because both of their girlfriends lived there. Johnson testified that he also did not know that Glass was a member of the Gangster's Disciples.

Johnson testified that he met Robert Walker for the first time at the preliminary hearing. Johnson testified that he had met Raniko Bonner when he took Phillips to her apartment. Johnson further testified that he did not know Jefferson before he was arrested, and he maintained that he had only met the victim once. Johnson testified that he did not go to Bonner's apartment during the day on November 3, 1997, but he admitted that he did go there that night.

Johnson testified that on November 4, 1997, he saw Glass walking, so he gave him a ride. Glass asked if he could put a bag in the trunk. Johnson said that he eventually dropped Glass off at Kingsgate Apartments. Johnson testified that his car was having some problems, so on November 4, 1997, he took the car to Phillips' apartment complex because Phillips and Farris knew some mechanics that would work inexpensively.

When Johnson returned to work on Saturday, the car still was not fixed. The mechanic told Johnson that he needed a wrench, so Johnson testified that he looked in his trunk to find one. When Johnson looked in the trunk, he saw that Glass' bag was still there. Johnson testified that he went through the bag and found a gun. Johnson testified that he went inside and told Phillips that Glass left a gun in his car. According to Johnson, Phillips told him that he couldn't bring the gun inside, so Johnson put the gun back in the trunk of his car.

Johnson testified that he was driving his car on the night of November 3, 1997. Johnson testified that he was with his brother on the night of the murder; however, his brother failed to testify as to Johnson's whereabouts on that night. Johnson testified that he was at Phillips' residence when the police beeped him. Johnson stated that nobody answered when he called the number on his beeper. Johnson recalled that after attempting to return the call, he left.

Totti Brown, Tony Phillips' roommate at the time of the offense, testified that Johnson and Jefferson frequently came to her apartment to see Phillips. Brown testified that on November 9, 1997, she was at home with

Phillips and Johnson. At some point during the day Johnson received a page. Brown recalled that Johnson called the number on the pager, but nobody answered. According to Brown, Johnson then told Phillips that he was going to leave because "he didn't know what was going on." Brown testified that Phillips left about thirty minutes later. Soon thereafter, the Memphis Police Department arrived looking for Johnson.

Debra Falasco testified that she works for the Title Division of the Shelby County Clerk's Office. As part of her job, Falasco is custodian of vehicle ownership records in Shelby County. Falasco testified that on October 21, 1997, Larry Johnson applied for a title on a blue 1984 Buick LeSabre. The license plate number in her records matched the one on Larry Johnson's car.

Dr. Wendy Gunther, Medical Examiner for Shelby County, performed the autopsy on the victim. Dr. Gunther testified that the cause of death was gunshot wounds to the victim's head, neck, and torso. Dr. Gunther testified that probably six or seven bullets went through the victim's body. According to Dr. Gunther, two bullets went through the victim's head.

State v. Johnie Jefferson and Larry Johnson, Nos. W1999-00747-CCA-R3-CD and W2000-01970-CCA-R3-CO, 2001 WL 1218287, at *1-7 (Tenn. Crim. App. Oct. 21, 2001), perm. app. denied (Tenn. Mar. 11, 2002).

The petitioner appealed his conviction. He also sought relief in his first petition for writ of error coram nobis, which was denied by the trial court. Id. at *1.[1] The direct appeal and denial of the petition for writ of error coram nobis were consolidated for appellate purposes. Id.

In his direct appeal, the petitioner argued, among other things, that the evidence was insufficient to sustain his conviction and that the court erred in denying his motion to sever his case from that of his co-defendant, Larry Johnson. Id. Johnson additionally argued that the trial court erred in denying his motion to suppress the evidence obtained during the search of his vehicle because the affidavit in support of the search warrant was insufficient to support the issuance of a search warrant. Id. at *12-13.

In his petition for writ of error coram nobis, the petitioner argued that he was entitled to a new trial based on newly discovered evidence in the form of a post-trial affidavit

---

[1] The petitioner and co-defendant Larry Johnson were joined in the appeal, but only the petitioner sought relief in a petition for writ of error coram nobis.

-10-

executed by Larry Johnson recanting his trial testimony and alleging that the petitioner was not involved in the murder. Id. at *14-15. The trial court determined that the affidavit lacked "'believability and credibility'" and denied the petition. Id. at *15. This court affirmed the convictions and the coram nobis court's denial of the petitioner's first petition for writ of error coram nobis. Id.

Thereafter, on October 15, 2002, the petitioner filed a petition for post-conviction relief, alleging ineffective assistance of counsel. Johnie Jefferson v. State, No. W2005-01965-CCA-R3-PC, 2006 WL 2935798, at *1 (Tenn. Crim. App. Oct. 13, 2006). One of the allegations raised by the petitioner was that counsel was ineffective for "failing to investigate the 'reliable witness' who provided information which was used by the police to obtain a search warrant for co-defendant Johnson's car." Id. at *4. The post-conviction court denied relief, and this court affirmed on appeal. Id.

On February 9, 2012, the petitioner filed a motion to reopen his post-conviction proceeding. On March 6, 2012, the petitioner filed a motion to amend the motion to reopen to a motion for writ of error coram nobis. The trial court entered an order dismissing the motion on July 26, 2012.

## ANALYSIS

On appeal, the petitioner argues that he is entitled to coram nobis relief because the State suppressed exculpatory evidence that became known to him after the limitations period had expired. A writ of error coram nobis is an extraordinary remedy by which the court may provide relief from a judgment under only narrow and limited circumstances. State v. Mixon, 983 S.W.2d 661, 666 (Tenn. 1999). Tennessee Code Annotated section 40-26-105 provides this remedy to criminal defendants:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial. The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause.

Tenn. Code Ann. § 40-26-105(b), (c) (2012).

The decision to grant or deny a petition for writ of error coram nobis based on newly discovered evidence lies within the sound discretion of the trial court. See Tenn. Code Ann. § 40-26-105; State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995). We review this issue, therefore, under an abuse of discretion standard.

The statute of limitations for filing a petition for writ of error coram nobis is one year from the date the judgment becomes final in the trial court. See Tenn. Code Ann. § 27-7-103; Mixon, 983 S.W.2d at 667. A judgment becomes final, for purposes of coram nobis relief, thirty days after the entry of the judgment in the trial court if no post-trial motion is filed, or upon entry of an order disposing of a timely filed post-trial motion. Mixon, 983 S.W.2d at 670-71. The State bears the burden of raising the bar of the statute of limitations as an affirmative defense. Sands v. State, 903 S.W.2d 297, 299 (Tenn. 1995). However, due process considerations may toll the limitations period. Workman v. State, 41 S.W.3d 100, 103 (Tenn. 2001). To determine whether due process tolling applies, courts should examine: (1) when the limitations period would normally have begun to run; (2) whether the grounds for relief arose after the limitations period normally would have commenced; and (3) if the grounds are later-arising, would a strict application of the limitations period deny the petitioner a reasonable opportunity to present the claim. Sands, 903 S.W.2d at 301.

In ruling, the trial court found that the statute of limitations had expired and that the petition was time-barred. The court noted that in order for due process to toll the running of the statute of limitations, the petitioner had to show that he requested the questioned exculpatory evidence, the State suppressed the information, and the evidence was favorable to him and material. The court determined that the information provided by Melissa Looney was not new or favorable to the petitioner – that "[i]t simply connects the two other co[-]defendants to the victim and there were several other witnesses who later connect[ed] the petitioner to the victim and his two co[-]defendants at another location outside this witness['s] knowledge." The court observed that the testimony of several witnesses, including one co-defendant, indicated that the petitioner and his two co-defendants "were [all] instrumental in the death of the victim . . . . This information provided by Ms[.] Looney simply corroborated other testimony."

Upon review, we cannot conclude that the trial court abused its discretion in denying and dismissing the petitioner's petition for writ of error coram nobis. There is no dispute that the petitioner filed this petition outside the limitations period, and the State raised the statute of limitations as an affirmative defense. Moreover, review of the considerations in Sands indicates that due process tolling of the statute of limitations does not apply in this case. First, the limitations period would have begun to run on October 18, 1999, thirty days after the trial court denied the petitioner's motion for new trial. Thus, the statute of limitations would have expired more than twelve years before the petitioner filed the instant petition for

writ of error coram nobis.

Second and third, the petitioner's claim is not clearly "later-arising," nor would a strict application of the limitations period deny the petitioner a reasonable opportunity to present the claim. Our opinion on direct appeal indicates that information about Melissa Looney and the "reliable witness" was known to the petitioner before or at the time of trial. At trial, Sergeant R.D. Roleson of the Memphis Police Department testified that he interviewed Looney and had her page one of the co-defendants, Larry Johnson, which he then used the return call to trace Johnson's location. Johnie Jefferson and Larry Johnson, 2001 WL 1218287, at *5. He stated that officers went to that location and had Johnson's car towed for processing. Id. Subsequently, officers obtained a search warrant for Johnson's vehicle based on information from a "reliable witness" who, in part, identified Johnson and Glass as the persons responsible for the victim's murder. Id. The search of Johnson's vehicle based on the "reliable witness's" statement was the basis for the petitioner's motion to sever his case from Johnson's, and one of the petitioner's post-conviction claims against counsel was that counsel provided ineffective assistance by failing to investigate the "reliable witness" who provided information that was used by the police to obtain a search warrant for Johnson's vehicle. Id. at *12; Johnie Jefferson, 2006 WL 2935798, at *4. The fact the petitioner, in a post-conviction proceeding, faulted trial counsel for failing to investigate the identity of the "reliable witness," indicates that the petitioner had a reasonable opportunity to present his claim long before he filed his second petition for writ of error coram nobis in 2012 and outside the reasonable opportunity afforded by due process.

In any event, the information provided by the "reliable witness" is not necessarily exculpatory. The "reliable witness" simply connected the two co-defendants to the victim and then other witnesses connected the petitioner to the two co-defendants and the victim. The evidence indicated that all three were involved in the death of the victim. We conclude that the petition is barred by the statute of limitations, and due process does not warrant tolling of the limitations period.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the dismissal of the petition.

_____
ALAN E. GLENN, JUDGE

-13-